## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROGENA MCGARRY, *et al.*, | No. 1:24-CV-01829 |
| Plaintiffs, | (Chief Judge Brann) |
| v. | |
| JACOB YEAGER, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

### MAY 6, 2025

## I.    BACKGROUND

On October 23, 2024, Plaintiffs Rogena McGarry and Jeffrey A. Bell, Sr. filed a five-count complaint against the following Defendants: Pennsylvania Parole Officers ("PO") Jacob Yeager and Todd Yarnell; Pennsylvania Department of Corrections ("DOC") Clerical Assistant Jenna Teeters; Pennsylvania DOC Corrections Officers ("CO") David Malligan, Bradley Fisher, and Tyler Anders; Pennsylvania DOC Registered Nurses ("RN") Kati Cruz, Kimbre Barnish, and Frederick Schleicher; Pennsylvania DOC Psychological Services Specialist Jessica Beeler; and unknown John and Jane Does.[1]

On December 18, 2024, all Defendants moved to dismiss the case for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[2] On December

---

[1]    Doc. 1 (Compl.).
[2]    Doc. 17 (First Mot. to Dismiss).

31, 2024, Plaintiffs responded by submitting an amended complaint, as was their right.[3] A week later, with defense counsel's consent,[4] they filed a second amended complaint to clarify their allegations.[5] The second amended complaint names the same defendants and adds one additional count.[6]

On January 10, 2024, Defendants filed a renewed motion to dismiss for failure to state a claim. The motion is now ripe for disposition; for the reasons that follow, it is granted in part and denied in part. Plaintiffs have expressly reserved the right to amend as to the dismissed Defendants—they are free to so move in the future and the Court will allow it if merited pursuant to Federal Rule of Civil Procedure 15(a)(2). In other words, those Defendants will be dismissed without prejudice.

## II.    DISCUSSION

### A.    Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[7] and

---

[3]    Doc. 18 (First Am. Compl.); Fed. R. Civ. P. 15(a)(1)(B).
[4]    *See* Doc. 20-1 (Suppl. Letter).
[5]    Doc. 20 (Second Am. Compl.).
[6]    Doc. 20. The John and Jane Doe defendants are included in the caption of the second amended complaint but are excluded from the body and do not appear in any of the briefing. Accordingly, the Court dismisses without prejudice the claims against the unknown defendants. Should discovery disclose additional potentially liable parties, Plaintiffs may seek leave to amend as appropriate.
[7]    550 U.S. 544 (2007).

*Ashcroft v. Iqbal*,[8] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[9] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[10]

## B.    Facts Alleged in the Second Amended Complaint

The facts alleged in the second amended complaint, which this Court must accept as true for the purposes of this motion, are as follows.

On March 28, 2024, Jeffrey A. Bell, Jr. ("Bell") was taken into custody by the Pennsylvania State Police for violating the conditions of his state-offense parole.[11] He spent that night at the Clearfield County Jail.[12] The next day, March 29, 2024, POs Yeager and Yarnell picked Bell up and drove him to SCI-Smithfield.[13] On the way, they called Bell's mother, Rogena McGarry, to inform her of Bell's

---

[8]    556 U.S. 662 (2009).

[9]    *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

[10]   *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

[11]   Doc. 20 ¶ 21.

[12]   *Id.*

[13]   *Id.* ¶ 22.

destination.[14] Rogena told the POs that Bell was suicidal.[15] She specifically told Yarnell and Yeager that Bell had threatened to commit suicide several times over the preceding days, and that she believed he needed to be placed on suicide watch at SCI-Smithfield or else he would commit suicide.[16]

In response to Rogena's warnings, Yarnell and Yeager advised her to call SCI-Smithfield.[17] They did not divert course to seek medical treatment for Bell's mental health crisis.[18] And when they arrived at SCI-Smithfield, Yarnell and Yeager did not pass along Rogena's message to the intake staff.[19]

Rogena followed the POs' advice and called SCI-Smithfield at around 1:15 p.m.[20] She dialed through the prison's automated menu to report an inmate who may be a suicide risk or experiencing a mental health crisis, and CO Malligan answered.[21] Rogena explained that Bell was on the way to SCI-Smithfield and that he had been threatening suicide over the preceding days.[22] She explicitly asked that he be placed on suicide watch.[23] Malligan responded that Bell had just arrived and that Rogena

---

[14]    *Id.* ¶ 23.
[15]    *Id.* ¶ 24.
[16]    *Id.*
[17]    *Id.* ¶ 25.
[18]    *Id.* ¶ 27.
[19]    *Id.* ¶ 28.
[20]    *Id.* ¶ 31.
[21]    *Id.* ¶¶ 32-33.
[22]    *Id.* ¶ 34.
[23]    *Id.*

would have to speak to the prison's operator.[24] Malligan did not tell anyone about Rogena's warning or take any other action in response.[25]

Malligan transferred Rogena's call to Clerical Assistant Jenna Teeters, and Rogena explained—for the third time—that Bell was suicidal, had threatened suicide several times over the preceding days, and needed to be placed on suicide watch.[26] Teeters replied that Bell had not yet been assigned an inmate number or a counselor and told Rogena to call back on Monday—three days later—once those steps had been completed.[27]  Teeters did not tell anyone about Rogena's warning or take any other action in response.[28]

Upon his arrival at SCI-Smithfield, Bell was processed for intake. The remaining RN and CO defendants performed an initial assessment, interview, and mental health screening during which Bell was dejected. He stated that "a lot of people," meaning individuals who had been present at SCI-Smithfield when Bell had been in custody there a few months earlier, "are going to be disappointed in me," explained that he was upset about his wife leaving him and had recently lost his job, and noted that he had been unmedicated for several months.[29] It was also clear to the

---

[24]  *Id.* ¶ 35.
[25]  *Id.* ¶ 36.
[26]  *Id.* ¶ 39.
[27]  *Id.* ¶ 40. March 29, 2024, was a Friday, and this call took place in the early afternoon. Teeters was therefore advising Rogena that she could renew her concern about her son's potentially imminent suicide in approximately 67 hours (8 a.m. Monday).
[28]  *Id.* ¶ 41.
[29]  *Id.* ¶¶ 45-46, 51, 60.

intake staff that Bell had recently relapsed and was therefore detoxing from drugs.[30] Because of Bell's prior time at SCI-Smithfield, several of the individuals performing the intake assessments were aware that Bell had previously received regular mental health treatment and had been prescribed psychotropic medication for depression and anxiety by the prison's own medical personnel.[31] Nevertheless, no one made the decision to deem Bell a suicide risk and place him in SCI-Smithfield's suicide protocol, which would have triggered precautions like suicide-resistant housing and increased supervision.[32]

Over the next two days, prison staff performed two detox assessments: Bell was clearly not doing well. On March 30, he told RN Barnish that he was anxious and suffering from cold sweats, tremors, and generalized pain.[33] And in the afternoon on March 31, he told RN Schleicher that he "felt like shit," continued to experience anxiety, shakes, and sweats, and had begun to feel nauseous.[34] Neither RN took any steps to reduce the risk of Bell's suicide.[35]

At around 8:00 p.m. on March 31, 2024, Bell was found dead in his cell, having hanged himself from his bunk bed using a bed sheet.[36] The prison informed

---

[30]   *Id.* ¶¶ 50, 55.
[31]   *Id.* ¶ 62.
[32]   *Id.* ¶ 63.
[33]   *Id.* ¶¶ 65-66.
[34]   *Id.* ¶¶ 71-72.
[35]   *Id.* ¶¶ 68-69, 74-75.
[36]   *Id.* ¶¶ 77-78.

Bell's family the next afternoon, nearly eighteen hours after discovering Bell's body.[37]

## C.    Analysis

A few preliminary issues need cleaning up before getting to the real analysis. I'll start with the easily dismissible claims before deciding whether Plaintiffs' "State Created Danger" claim should be dismissed under the more-specific-provision rule. Then I'll turn to the Eighth Amendment claims.

### 1.    Consented Dismissal

Plaintiffs consent to the dismissal of their claims against COs Fisher and Anders, RNs Cruz, Barnish, and Schleicher, and Specialist Beeler.[38] Defendants argue that the dismissal should be with prejudice since we are currently on the "Second Amended Complaint,"[39] while Plaintiffs ask that the dismissal be without prejudice so that they can renew their claims should discovery uncover a basis for liability.[40] Defendants ask too much.

Although this is technically Plaintiffs' third complaint, the First Amended Complaint was filed as a matter of right, and Court did not pass on the viability of Plaintiffs' claims in their initial form. The Second Amended Complaint subsumed the First—with Defendants' consent—for the limited purpose of "address[ing] some

---

[37]    *Id.* ¶ 79.
[38]    Doc. 24 (Opp'n) at 1 n.1; Doc. 25 (Reply) at 13-14.
[39]    Doc. 25 (Reply) at 14.
[40]    Doc. 24 at 1 n.1.

clarity issues."[41] So there is no real basis to conclude that another amendment would be some unfair "fourth" attempt to state a claim. From the Court's perspective, it would really be the second try, no matter what number technically adorns the filing's heading. I generally permit at least two attempts to get things right, unless one of the standard reasons for denying amendment applies, and Defendants do not argue that any should here.[42]

Moreover, Plaintiffs don't appear to have any interest in trying to merely *replead* their claims as to this set of Defendants. They want a chance to gather evidence and will only bring a Defendant back into the case if warranted.[43] Essentially, they admit that they probably can't state a claim on the limited set of facts they know today, but, if new information changes their understanding of events, they want to be able to litigate against the right people. Accordingly, Plaintiffs' claims against Fisher, Anders, Cruz, Barnish, Schleicher, and Beeler are dismissed without prejudice.

### 2.    More Specific Provision

All of Plaintiffs' claims are brought under the Eighth Amendment save Count I, which asserts a Fourteenth Amendment substantive due process claim for "State

---

[41]    Doc. 20-1 (Letter).
[42]    *See Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)) (examples include undue delay, bad faith, dilatory motive, prejudice, and futility).
[43]    Doc. 24 at 1 n.1 (Plaintiffs "reserve the right to reinstate their claims pending further discovery").

Created Danger" against Yeager and Yarnell.[44] Defendants contend that Count I is just like the rest—an Eighth Amendment deliberate indifference claim lurking in substantive due process clothing.[45] Plaintiffs maintain that they have stated two different and equally viable claims because the causes of action arise under different amendments.[46] Plaintiffs' sole point on this issue sputters immediately, and Defendants are generally right that an Eighth Amendment claim is a better fit here. Moreover, even if the state created danger framework were viable, Plaintiffs have failed to state a claim.

"Under the more-specific-provision rule, 'if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'"[47] The more-specific-provision rule is not amendment-specific, as Plaintiffs would seem to have it.[48] It is instead *designed* to channel substantive due process claims to other, more specific amendments when

---

[44] Doc. 20 at 12. Counts V and VI are state law wrongful death and survival claims, but those statutes do not create an independent cause of action—they merely authorize certain individuals to bring suit to recover for the death of another. Accordingly, those Counts rise or fall with the substantive claims.

[45] Doc. 23 (Mot. Brief) at 8-10.

[46] Doc. 24 at 3.

[47] *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 447 (3d Cir. 2020) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997))

[48] Doc. 24 at 3 ("The PO Defendants confuse Plaintiffs' state created danger claim with an Eighth Amendment failure to protect claim . . . . However, the only framework under which a state created danger claim can be analyzed is the Fourteenth Amendment's substantive due process clause.").

they might apply. In contrast to Plaintiffs' position that Fourteenth Amendment due process claims cannot be redirected to the Eighth Amendment, that is in fact an extremely common application of the rule.[49] The claims in this case make it a good candidate for another of those applications.

Under the state-created danger doctrine, "when [the Government] affirmatively places a person in a position of danger that the person would not otherwise have faced," the Fourteenth Amendment's substantive due process clause requires the Government to provide protection from that danger.[50] When the person is in criminal custody, however, challenges to the conditions of confinement, including arguments that the Government has not provided adequate protection, stem from the Eighth Amendment's prohibition on cruel and unusual punishments.[51] Here, Plaintiffs argue that Yeager and Yarnell created a danger by not taking Bell (in custody on a parole violation) to a hospital once informed of his suicidal propensity. That is just another way of saying that they didn't take adequate steps to protect him from harm, which is the well-worn province of the Eighth

---

[49]  *Porter*, 974 F.3d at 447-48 (and discussing same result in *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260-61 (3d Cir. 2010) and *Wharton v. Danberg*, 854 F.3d 234, 246 (3d Cir. 2017)); *cf. DeLade v. Cargan*, 972 F.3d 207, 210-13 (3d Cir. 2020) (redirecting substantive due process claim to Fourth Amendment).

[50]  *O'Donnell v. Scranton Sch. Dist.*, 615 F. Supp. 3d 262, 275 (M.D. Pa. 2022) (quoting *Mears v. Connolly*, 24 F.4th 880, 883 (3d Cir. 2022)); *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006).

[51]  *See Betts*, 621 F.3d at 259-61; *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (holding that the Government has an Eighth Amendment "obligation to provide medical care for those whom it is punishing by incarceration").

Amendment—indeed, this Circuit has developed a unique Eighth Amendment test for use to determine custodial liability when an inmate commits suicide.[52] Accordingly, the more-specific-provision rule applies and prohibits Plaintiffs from proceeding under the Fourteenth Amendment's substantive due process clause.[53]

Plaintiffs' state-created danger claim also fails because they have not pled all of the required elements. Those elements are:

> (1) the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed.[54]

Here, the fourth element—sometimes called the "affirmative act" requirement—is lacking. To meet that requirement, the Plaintiffs must show that the defendant took action which "resulted in a departure from the status quo."[55] It not sufficient to allege a "failure *to do something*."[56] Plaintiffs argue that Yeager and Yarnell "acted affirmatively by taking custody of [Bell] and transporting him to an environment that rendered him more vulnerable to suicide."[57] That framing ignores Plaintiffs'

---

[52] *See Colburn v. Upper Darby Twp.*, 838 F.2d 663, 669 (3d Cir. 1988) ("*Colburn I*"); *Palakovic v. Wetzel*, 854 F.3d 209, 223-24 (3d Cir. 2017).

[53] *Beenick v. LeFebvre*, 684 F. App'x 200, 205 (3d Cir. 2017) (citing *Betts*, 621 F.3d at 259-61).

[54] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (citing *Bright*, 443 F.3d at 281).

[55] *Johnson v. City of Phila.*, 975 F.3d 394, 401 (3d Cir. 2020) (quoting *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 242-43 (3d Cir. 2016)).

[56] *Id.* at 402 (citing *Burella v. City of Phila.*, 501 F.3d 134, 146-47 (3d Cir. 2007)) (emphasis in original).

[57] Doc. 24 at 6.

own description of Yeager and Yarnell's conduct: "the PO Defendants ignored Rogena's cry for help and *continued to transfer* [Bell] to SCI-Smithfield—rather than a medical provider for emergency mental health treatment."[58] It is clear from Plaintiffs' allegations that delivery to SCI-Smithfield was the status quo, and the challenged conduct is Yeager and Yarnell's decision not to change plans based on the new information Rogena provided. That is a textbook "failure to do something" which is not recoverable on a state-created danger claim.

Accordingly, Count I is dismissed.

### 3.    Eighth Amendment

With that prelude complete, I turn now to the meat of Plaintiffs' claims against all remaining Defendants: Plaintiffs argue that Yeager, Yarnell, Malligan, and Teeters—the four individuals whom Rogena told that her son was suicidal—were deliberately indifferent to Bell's serious medical need in violation of the Eighth Amendment when they did not take any action to protect him from suicide.[59]

The Eighth Amendment to the United States Constitution prohibits infliction of "cruel and unusual punishments."[60] "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'

---

[58]  Doc. 24 at 1; *see id.* at 5 ("[R]ather than transport [Bell] to a medical provider for a mental health evaluation, the PO Defendants simply dropped him off at SCI-Smithfield."); Doc. 20 ¶ 27.

[59]  Plaintiffs' constitutional claims are brought pursuant to 42 U.S.C. § 1983, which provides a procedural vehicle for private plaintiffs to enforce the Constitution. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). That Section 1983 permits Plaintiffs to sue Defendants is undisputed.

[60]  U.S. Const. amend. VIII.

proscribed by the Eighth Amendment."[61] "A particular vulnerability to suicide represents a serious medical need."[62] The Third Circuit has established a framework for analyzing Eighth Amendment deliberate indifference to medical needs claims in the context of prison suicides. To make out an Eighth Amendment claim, "a plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability."[63] Additionally, as in any Section 1983 case, liability requires satisfying the "traditional tort concepts of causation,"[64] including but-for and proximate cause.[65]

Defendants argue that Yeager and Yarnell are not liable on an Eighth Amendment claim because (1) they were not responsible for Bell's care at SCI-Smithfield and (2) they acted reasonably (i.e., were not deliberately indifferent). Defendants further argue that none of them is liable because they are not medical professionals and therefore were reasonable in relying on the prison's medical staff

---

[61] *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell, & Stevens, JJ.))

[62] *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) ("*Colburn II*")).

[63] *Colburn II*, 946 F.2d at 1023 (citing *Colburn I*, 838 F.2d at 669).

[64] *Bingham v. Lancaster Cnty.*, 709 F. Supp. 3d 176, 188 (E.D. Pa. 2024) (quoting *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007)); *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000) (quoting *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999)).

[65] *Malles v. Lehigh Cnty.*, 639 F. Supp. 2d 566, 576 (E.D. Pa. 2009) (citing *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997)).

to evaluate Bell and take protective action if necessary. I begin with the arguments unique to Yeager and Yarnell before turning to Defendants' "medical staff" point.

### a.    Yeager and Yarnell

### i.    Responsibility

Defendants' responsibility argument is extremely narrow. They contend that this Circuit in *Williams v. Borough of West Chester* adopted a bright-line rule that defendants who do not have "responsibility for the care of prisoners" cannot be liable for deliberate indifference.[66] And that rule applies here, they say, because Yeager and Yarnell did not have responsibility for the care of prisoners at SCI-Smithfield.[67] Confusingly, however, Defendants expressly disavow the idea that they are advancing a "custody-based" argument.[68] Although I understand *Williams* itself to involve at least custody-adjacent reasoning and, on my reading, Defendants' position logically implicates questions of custody, I will accept their disclaimer and focus only on what *Williams* means for Yeager and Yarnell. Not very much, it turns out. Defendants' reading stretches *Williams* far beyond its holding. Moreover, even if Defendants were correct, the rule would not protect Yeager and Yarnell.

In *Williams*, the Third Circuit held that Police Dispatcher Steven McBride was not liable for detainee Ronald Williams's suicide on a theory of deliberate

---

[66]  Doc. 25 at 8 (quoting 891 F.2d 458, 466-67 (3d Cir. 1989)).
[67]  *Id.* at 8-10.
[68]  *Id.* at 9.

indifference.[69] In so holding, the Third Circuit came nowhere near declaring an absolute rule like the one Defendants press. Instead, considering the "circumstances" that "dispatchers have no responsibility for the care of prisoners" and "that McBride could not easily see the cell where Ronald was being held from his desk," McBride was not deliberately indifferent when he failed to take steps to prevent Williams's suicide.[70] At most, *Williams* demonstrates that an individual's responsibilities are a relevant consideration in determining whether he was deliberately indifferent.

Defendants' overbroad reading of *Williams* would produce untenable results. Consider a hypothetical dispatcher like McBride who happens to be walking past an inmate's cell on a trip to the water cooler. As the dispatcher walks by, the inmate tightens a sheet around his neck and rolls off the top bunk, beginning to choke. As Defendants would have it, the dispatcher can simply shake his head and walk away, safe in the knowledge that he is absolved of liability by his technical lack of responsibility as he listens to the inmate flail and die. That is not correct.

In any event, Yeager and Yarnell would not fall within the scope of their own rule. In *Williams*, McBride undisputedly had "*no* responsibility for the care of prisoners."[71] The Third Circuit repeatedly noted that McBride was a "civilian," not a police officer or guard, and that his role was significantly different from employees

---

[69]  891 F.2d at 466-67.

[70]  *Id.*; *see id.* at 462 n.6 (testimonial evidence that "it would not be appropriate for McBride to check on the prisoners").

[71]  *Id.* at 466-67 (emphasis added).

with "custodial responsibilit[ies]."[72] Yeager and Yarnell are Parole Officers who undisputedly *had actual custody* of Bell when they were transporting him from Clearfield County to SCI-Smithfield. If a rule does protect employees like McBride, it doesn't apply to Yeager and Yarnell.

Again, Defendants' contention that *Williams* is somehow distinct from a "custody-based" argument, rather than a specific flavor of one, seems to fly in the face of logic. Indeed, as the preceding paragraph makes clear, Defendants' argument *depends on* a custody issue: that Yeager and Yarnell's responsibility for Bell ended when they *transferred custody* to SCI-Smithfield.[73] The only way I can make sense of the position is that Defendants hope that I will reflexively apply a rule derived from an unreasonably broad reading of *Williams* to circumvent the clear law establishing—via standard proximate cause analysis—that a state officer can be liable for an inmate's suicide even when the suicide occurs after the officer's custodial role has ended.[74] I reject the bait. Plaintiffs' framing of the issue and legal conclusions are far sounder: "The mere fact that an individual was not a prisoner's

---

[72] *See id.* at 461.

[73] Doc. 23 at 13 (emphasizing that "these Defendants 'relinquished custody' of Mr. Bell at the prison").

[74] *Owens v. City of Phila.*, 6 F. Supp. 2d 373, 382-83 (E.D. Pa. 1998); *see Richards v. Se. Ala. Youth Servs. Diversion Ctr.*, 105 F. Supp. 2d 1268, 1272, 1276-77 (M.D. Ala. 2000) (explaining why an "actual custody" rule is illogical when a plaintiff was in state custody); *Conn v. City of Reno*, 572 F.3d 1047, 1061-62 (9th Cir. 2009), *amended and reh'g denied by* 591 F.3d 1081 (9th Cir. 2010), *vacated*, 563 U.S. 915 (2011), *reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011).

custodian at the exact time of their death is not a bar to a deliberate indifference to suicide claim."[75]

### ii.    Reckless Indifference

*Colburn* teaches that "reckless indifference" entails at least "something beyond mere negligence."[76] In holding that this inquiry requires an analysis of each case "on its own facts," the Third Circuit explained that three previously-litigated fact patterns "provide helpful guidance in determining whether a case meets the . . . standard."[77] Specifically, a defendant may be recklessly indifferent if she: (1) "took affirmative action directly leading to the suicide"; (2) "actually knew of the suicidal tendencies of a particular prisoner and ignored the responsibility to take reasonable precautions"; or (3) "failed to take 'necessary and available precautions to protect the prisoner from self-inflicted wounds.'"[78] Ultimately, "whether or not a defendant's conduct amounts to deliberate indifference has been described as a classic issue for the fact finder."[79]

---

[75]   *Redclift v. Schuylkill Cnty.*, No. 21-CV-1866, 2022 WL 3951356, at *4 (M.D. Pa. Aug. 31, 2022).

[76]   *Palakovic*, 854 F.3d at 222, 224 & n.15 (using the terms "reckless indifference" and "deliberate indifference" interchangeably and stating that it was "not . . . necessary to parse these phrases to determine whether there is some distinction between them" (citing *Colburn II*, 946 F.2d at 1024-25)).

[77]   *Id.* at 231.

[78]   *Id.* (citing *Freedman v. City of Allentown*, 853 F.2d 1111, 1115-16 (3d Cir. 1988)).

[79]   *Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 111 (3d Cir. 2007) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 588 (3d Cir. 2004)); *see Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582-83 (3d Cir. 2003) (denying summary judgment on deliberate indifference claim because "a reasonable jury" could hold either way).

Defendants argue that Yeager and Yarnell's conduct does not rise to the level of deliberate indifference (or even negligence) because they directed Rogena to call "the prison hotline dedicated to processing information relating to suicide risks."[80] In other words, they contend that Yeager and Yarnell, though concededly aware of Bell's suicidal tendencies, did take reasonable precautions. In the Court's view, whether it is reasonable, negligent, or recklessly indifferent to merely pass along someone else's phone number in response to an unambiguous and urgent warning of serious consequences is a question that should not be resolved as a matter of law at this stage of the litigation without the benefit of discovery.

Defendants' best case[81] on this issue is *Freedman v. City of Allentown*, in which the Third Circuit held that Frank Kroboth, Freedman's state probation officer, was not deliberately indifferent when he failed to warn a detaining officer that Freedman had suicidal tendencies and a history of suicide.[82] On the allegations in that case, Kroboth simply knew that Freedman had previously attempted suicide.[83] The Third Circuit determined that his failure to relay that information to the detaining officer did not rise above mere negligence.[84] In reaching that conclusion, the panel reasoned that Kroboth, like the defendant officers in *Davidson v. Cannon*,

---

[80]   Doc. 23 at 13-14.
[81]   Defendants do not actually press this case (or any other) for factual comparison.
[82]   853 F.2d 1111, 1117 (3d Cir. 1988)
[83]   *Id.* at 1117.
[84]   *Id.*

did not "abus[e] governmental power . . . [but rather] mistakenly believed that the situation was not particularly serious."[85] As I read the case, the Third Circuit determined that Kroboth's failure to proactively tell detaining officers about Freedman's past suicidal tendencies, without prompting or any reason to believe that those tendencies were surfacing at that moment, was not deliberately indifferent (although possibly negligent).[86]

Other cases make clear that *Freedman* did not broadly hold that a failure to warn can never rise to deliberate indifference. For example, in *Owens v. City of Philadelphia*, the Honorable Louis H. Pollak, writing for the United States District Court for the Eastern District of Pennsylvania, denied summary judgment to a prison guard on a deliberate indifference claim.[87] When an inmate expressed a desire to commit self-harm, the guard called the inmate's psychiatrist, who agreed to issue a pass for the inmate to report for treatment.[88] The guard then did not deliver the pass to the inmate and did not note any of the events in the officers' log, nor did he inform the guards on the next shift of the inmate's comments or the pending pass.[89] Shortly after the shifts changed, the inmate was found dead in his cell.[90] Given evidence suggesting that the guard knew the inmate had a legitimate suicidal propensity,

---

[85] *Id.* (quoting 474 U.S. 344, 347-48 (1986)).
[86] *See id.*
[87] 6 F. Supp. 2d 373, 382-83 (E.D. Pa. 1998).
[88] *Id.* at 376.
[89] *Id.*
[90] *Id.* at 377.

Judge Pollak concluded that the guard's failures: "(1) to note Gaudreau's statement about hurting himself in the prison log, (2) to inform the incoming officers of Gaudreau's statement, (3) to inform his superior officer of the incident, and (4) to fill out an involuntary commitment form," "[could not] be said to be constitutionally reasonable as a matter of law."[91] Judge Pollak distinguished *Freedman* in part by explaining that "the failure to inform in *Freedman* concerned the detainee's prior medical history, not, as in this case, an expression of suicidal intent made a few minutes before the relevant officer's shift ended."[92]

On facts similar to those in the case at bar, Chief Judge W. Harold Albritton III, writing for the United States District Court for the Middle District of Alabama, denied summary judgment to a transporting officer in part because he failed to warn the officials receiving custody of the detainee's suicidal intent.[93] In *Richards*, the detainee's mother repeatedly warned that transporting officer that her son was suicidal in the days leading up to and on the day of his transportation.[94] Nevertheless, the transporting officer performed only a cursory search and did not warn any of the subsequent custodians that the detainee might be suicidal.[95] Shortly after custody was transferred, the detainee produced a gun and shot himself.[96] Chief Judge

---

[91] *Id.* at 382.
[92] *Id.* at 383 n.9.
[93] *Richards*, 105 F. Supp. 2d at 1275-76.
[94] *Id.* at 1272.
[95] *Id.*
[96] *Id.* at 1273.

Albritton reasoned that summary judgment was inappropriate in part because the transporting officer did not warn others in the chain of custody that the detainee was suicidal, and there was testimony that failing to do so was "reckless and wanton."[97]

Viewed in the light most favorable to Plaintiffs, I think the allegations here could support a finding of deliberate indifference. Yeager and Yarnell received a call from Bell's mother explicitly warning them that Bell was suicidal and asking that he be placed on suicide watch immediately.[98] They responded by directing her to call SCI-Smithfield.[99] That may be a "reasonable precaution," but it is far from clear that it is sufficient to protect the officers from liability.[100] On Plaintiffs' allegations, Yeager and Yarnell did *nothing* to make sure that Rogena had made contact when they reached the prison.[101] Passing along the relevant information to prison officials would likely not have been particularly onerous, and it would be fair to view the additional step as part and parcel of a full effort to take reasonable precautions to prevent against suicide. What is reasonable is context specific and, where there is a clear and present danger of suicide, a jury might fairly find that passing the buck is not a reasonable precaution, and instead is more culpable than mere negligence.

---

[97] *Id.* at 1275-76; *see also Redclift*, 2022 WL 3951356, at *1, 4 (denying motion to dismiss by transporting officer on failure to warn theory).

[98] Doc. 20 ¶ 24.

[99] *Id.* ¶ 25.

[100] *See Owens*, 6 F. Supp. 2d at 382 ("Calling the Hahnemann Unit was, without question, a reasonable and appropriate action . . . [However] [t]he fact that Murphy called Wainwright and knew that Wainwright intended to issue a pass does not insulate Murphy from the possibility that any of his other acts or omissions could be found to have been deliberately indifferent.").

[101] Doc. 1 ¶ 28.

Evidence produced in discovery may change this calculus. But at the motion to dismiss stage, Plaintiffs have alleged behavior that could reasonably be viewed as sufficiently culpable to state a claim for deliberate indifference.

### b.    Yeager, Yarnell, Malligan, and Teeters

Defendants argue that everyone who knew that Bell was suicidal should nevertheless be dismissed because Bell was subject to intake procedures conducted by medical professionals. Defendants contend that the non-medical staff could rely on the medical professionals to determine whether Bell was suicidal, so there was no need to pass along warnings to that effect.[102] Defendants again overstate the import of the cases on which they rely.

Defendants argue that *Spruill v. Gillis*[103] and *Lawniczak v. County of Allegheny*[104] stand for the proposition that non-medical custodians cannot be liable on a deliberate indifference to a need for medical care theory if the detainee received some attention from medical staff. But *Spruill* did not involve a risk of suicide; in that case, the inmate complained of pain in his back and leg and a fall.[105] He first informed a guard that he needed medical help *after* he had already spoken to a nurse about the same problems, and he saw a doctor regarding the relevant issues a day

---

[102]  Doc. 23 at 14-15.
[103]  372 F.3d 218, 236 (3d Cir. 2004).
[104]  811 F. App'x 743, 746-47 (3d Cir. 2020).
[105]  372 F.3d at 223-25.

after speaking to the guard.[106] The guard could not liable because the inmate "was receiving a minimal measure of medical attention" before the doctor saw him, and his condition was not "dire and obvious" when speaking to the guard.[107]

In *Lawniczak*, the plaintiff contended that guards were deliberately indifferent when they did not warn medical staff that the inmate was suicidal and he subsequently committed suicide.[108] But the facts established that the guards had placed the inmate in a cell with suicide precautions and fully restrained his wrists, waist, and ankles.[109] Although the guards did not expressly tell the attending nurse that the inmate was suicidal, she examined him "moments after he was placed in the restraint chair" and while he "continued to threaten 'to harm everyone present, including himself.'"[110] Thus, his mental health issues were readily apparent to everyone present. *Spruill* and *Lawniczak* are distinguishable and do not control here.[111]

More to the point, *Spruill* does declare a rule like Defendants describe, but, properly applied, it doesn't protect them. The Third Circuit in *Spruill* held that, when a detainee is receiving medical treatment, "absent a reason to believe (or actual

---

[106] *Id.* at 223-24.
[107] *Id.* at 236-37.
[108] 811 F. App'x at 745.
[109] *Id.* at 746.
[110] *Id.*
[111] Defendants also cite *Abran v. City of Phila.*, No. 20-3503, 2021 WL 5401542, at *3 (3d Cir. Nov. 18, 2021), but that unpublished case involved essentially ongoing provision of medical care focused on the same health issues presented to the non-medical defendant.

knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."[112] Here, Defendants *did* have a reason to believe that the SCI-Smithfield medical staff might not properly treat Bell: they did not have all of the relevant information about his mental state. It is safe to assume that a medical provider's diagnosis would be more accurate if she knows that her patient had recently threatened suicide multiple times and that his immediate family was concerned that he would imminently take his own life.[113] This issue further distinguishes *Spruill* and *Lawniczak*, in which the custodial officials had good reason to believe that the treating medical staff knew the relevant facts. Without passing along Rogena's warning, Defendants could not reasonably expect that SCI-Smithfield's medical staff could properly diagnose Bell, and they therefore are not protected by the provision of medical treatment.

Defendants offer no other arguments for dismissal so the motion to dismiss is denied as to Yeager, Yarnell, Malligan, and Teeters.

## III. CONCLUSION

For the above-stated reasons, Defendants' motion to dismiss pursuant to Rule 12(b)(6) is granted in part and denied in part. To the extent it is granted, the

---

[112] 372 F.3d at 236.
[113] *See Conn*, 572 F.3d at 1061 ("When medical examiners have insufficient information about the patient they are diagnosing, they are likely to give an inaccurate diagnosis.").

Defendants are dismissed without prejudice. If they wish to do so, Plaintiffs may seek leave to amend at some point in the future by filing a motion under Rule 15(a)(2).

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge